May it please the Court, my name is David Chesnoff of the firm of Chesnoff & Schoenfeld in Las Vegas, Nevada. I have the privilege of representing Ms. Soni in this appeal which deals directly with the question of whether or not Pardon me. Thank you. The calculation that was reached by Judge Mahan in the court below was proper in determining what guideline range and what sentence he would ultimately give to the plaintiff. May I just ask a preliminary question? Has the sentence been served? She's serving it now and there's still time to remedy. All right. Thank you. We had requested actually bail pending this appeal in hopes that we could get the sentence squared away before she started serving because we actually believe based on our calculation she would have been eligible for some home confinement. But the answer to your question is she's in it now and I would hope that For once we've been expeditious in how we've proceeded so we'll continue to keep that in mind. I appreciate that very much, Your Honor. This is a very unique situation in that the defendant pled straight to the charges and then at the change of plea her counsel below Mr. Draskiewicz was very careful to delineate serious objections to factual assertions by the government as to her conduct and her culpability so that he could preserve at the time of sentencing a serious discussion of whether or not she had factually committed some of the acts that the government ultimately would try to attribute to her for purposes of the calculation. Most importantly, there were 19 cards that were seized. She had gone to a hotel in Las Vegas, a casino with some Confederates. She had made a small purchase, I believe it was $16. I think we know all the facts but you've got a number of issues that I'd like you to just sort of jump into. I'm confident the judges are all familiar with the facts here. But on the intended loss part of it, I sentenced a lot of people in my day but I haven't sentenced under something like this. Now you have the $16 try and then you've got the $28 cash advance and it's nipped in the credit cards and we've got fake IDs and of which I think that your client, there's pictures with her, right? Right. All right. So and it's intended loss. It's not actual loss. So I guess we could say we don't have a pattern maybe because we only have, they only got to try one card. But and then you have out there the parameters in terms of the $500, you can go $500 each card once you can establish they intended to use them. So let's assume that because they have all these cards, because they have all these IDs, that they intended to use them and we do have one transaction. Why isn't the fact that they did $2,800 the first time as good a guess as $500? Well, Your Honor... I mean, I don't know what, you know, what can we present here when someone gets nipped in the bud? I think you have to apply the standard that was established by Allison, especially after the point in time where the guidelines were changed so that Allison became the law, which is to say you have to have a realistic economic approach. If they had used two cards for $2,800, would your argument be different? Would $2,800 a card be a good one? I think it would give more information to the court. But I know you don't want to hear about the facts, Your Honor, but one fact is important. The judge initially... No, I do want to hear if it's important, not just all of them. Thank you, Your Honor. I would respectfully submit that the fact that Judge Mahan himself said it was sheer speculation and the government asked for a continuance in order to bring witnesses to establish a realistic economic approach, which is what this Court has mandated, and then they come to the second continued sentencing without anybody with them to support their position and they had filed the night before a memo which attempted to reflect what they believed the potential use for some of the cards were, that's not the realistic economic approach that Allison was talking about. And most respectfully, there were two ways to do this. You could either say $500 a card or you could take the average, the $2,800 and the $16, and you could add them together and divide it by two and come up with a number, which I did, which comes to $27,842 and reach a realistic economic approach to this. So averaging $16,800 and $16,800 in your view would be okay? Better than saying... Well, not better. It would be, would you concede that that would pass muster here? If I can be presumptuous enough to say that if I were a sentencing judge, yes, that's a formula that I would use or I would use the $500, but I certainly wouldn't pick $2,000 out of the air, especially after I've already conceded at a prior sentencing date that it's sheer speculation to do that. Okay. So I think with respect to that, we can come to a number that would reduce my client's sentence. Also, in a lot of these cases is, you know, I know in federal court there's a lot of the first squeal gets the deal and then you bring someone in and like, for example, a co-conspirator would come in and say, okay, we had this elaborate plan and we were going to charge, you know, we were going to do a little purchase, then we were going to go $2,800 and we were going to do it on all the cards. Okay. Then you're sunk, right? If they'd had a witness like that. I would... Okay. But they didn't call anyone like that. So in all conspiracies, you're not going to have someone in that will come and do that. So then you're saying we need more of a pattern or we need it. We need an average. Yes. Or we can follow the commentary, which says... Or just go $500 a card. Absolutely. But there's got to be some standard that a defendant knows to defend him or herself at the time of sentencing. And in this case, it was this arbitrary figure after the government has specifically said, we're going to bring witnesses. Then moving on to the other reasons why the sentence was... I think this is sophisticated when you have a number of cards and you have, you've got to make IDs. You can break all these down and say, okay, not that big a deal. But there's obviously several people, there's a number of cards, there's IDs that have been made and five of them have your client's picture on them or anything along those lines. Why isn't that... It's not the most sophisticated, but why isn't that sophisticated? Because according to Judge Tashima, who has written two times in both Matano and Arabe, the distinction is, is it something that's so uniquely different from these type of cases? And in our fact situation, all of the traditional credit card fraud operations that you discussed are already contemplated by the guidelines in calculating the number of victims, the loss. There was nothing sophisticated in the sense that there was extra effort to conceal, like in a money laundering case or fake checks, like in the bank fraud cases. Or fictitious entities, corporate shills, offshore financial accounts, all of which are mentioned in the guidelines. Correct, Your Honor. You finished my... I'm sorry. No, I'm so appreciative. And in these cases, 19 cards is not a lot, is it? No, it's not. I mean, in fact, the government, in an effort to try to make it more sophisticated, started talking about conspiracies that were never admitted to, never pled to and not part of the indictment in this case. So it's not sophisticated as defined by Judge Tashima for this court, and it's because it's not different. I mean, she's basically, if you analogize, she's like a mule in a drug case, which was one of the cases that talked about sophistication. There's nothing special about how this was done. In fact, all she does is go to a casino, which most people in these circumstances do, and try to use the card. There's nothing to suggest that there was anything special about this particular operation. And then finally, Your Honors, with respect to the question of whether or not this was a use or possession of a device-making equipment, that on its face is clearly erroneous, Your Honor. There is no way that this is any kind of device-making equipment. It's false ID. And it wasn't false ID that was used to make more fake cards or licenses. It was what it was. And then to suggest that somehow she transported, when in fact the government admitted at the time of sentencing that somebody else transported it, it flies in the face of the definition under the guidelines. What's happened here is they tried to basically double penalize her for her actions by interposing definitions that do not apply. By our calculations, Your Honor, she'd be at a level 10. We would say there would be 4 points for the amount in controversy. It would start at a 6. She'd get 2 for 10 or more victims, bring it to an 8, 4 for the amount of money, and that's a 12, minus 2 for acceptance, and she'd be at a 10. And potentially Judge Mahan could let her be at home at this point in time. So I would respectfully request, Your Honor, that you take our arguments to heart and remand this to Judge Mahan with instructions that it's not... We'll apply them to the law, whether we'll take them to heart. I can't promise. Okay. Well, I appreciate that, Your Honor. And if I have 30 seconds and I need it, I'd ask for it. Thank you. May it please the Court. My name's Tim Busk, as I'm an assistant United States attorney out of the District of Nevada. Good morning. Good morning, Your Honor. Before I turn to the substantive issues addressed by defense counsel, I'd like to briefly touch upon the standard of review, because as I read the appellant's reply, I realized that a dispute remains, notwithstanding that in Killebrew, and I cite that on page 13 of my response, the Court set forth clearly that the Court reviews the district court's interpretation of the sentencing guidelines of the ANOVO, the district court's application of the sentencing guidelines to the facts of this case for abuse of discretion, and the district court's factual findings for clear error. But I think Staten's come about since, too, so that puts a clear and convincing standard on the enhancements, right? That would be my argument, Your Honor. And I was going to cite to the Court another case, and just briefly, that would be United States v. West Coast Aluminum Heat Treating Company, that's at 265 F. 3rd, 986, 990, where the Court, after again addressing the issue of method to calculate loss, would be to know, but it goes on to say that we review the district court's factual findings used in sentencing, including the calculation of loss to the victim for clear error. And so I believe it's a clear error standard that we would apply to these various factual determinations that are at issue here. With that, then, let me turn to the first of those issues, and that is the estimate of intended loss. Let me just ask a question here. If we say this is sophisticated, what kind of credit card fraud would not be sophisticated? My response to that, ma'am, is that in any world of credit card fraud, there is a wide range of what you can do with a credit card fraud. There are crimes of convenience where somebody can simply go into a Wal-Mart and use a credit card to charge whatever they can charge with it. Here, on the other hand, you're dealing with what I'll equate to an assembly line operation. That is, in this case, and it was admitted by the defendant at her change of plea, the credit cards originated in another district, another State, where they were stolen. They were then transported to Nevada. Once they got to Nevada, identification cards were manufactured. Were they transported by her? No, ma'am. All right. She had nothing to do with the transportation. In a conspiracy, my argument or my response to that is she is one of the workers in the assembly line. In fact, when you get to the end of the assembly line, I'll equate her as a shift supervisor. But if you go on through that assembly line Well, let's just say if we have a high – if we have a low and a high watermark, is what I say, and then everything falls. Are we kind of at the low end here of sophistication? No, I don't believe so at all, because with credit card fraud, the low end would be where I find a credit card on the street or I see it. On card. Okay. And you would concede that's not sophisticated. Even a few cards. And it's not so much the numbers I'm focusing on, but the additional steps that are taken, because not only do you have that transportation, not only do you have then the manufacturer of ID cards. These are ID cards that match the credit cards. That is, you'll have the picture of one of the conspirators, but the name of the person on the credit card. That in itself is fairly sophisticated from the government's perspective. But then you go forward from that, and it's not just one defendant going forward into these casinos. You have a team of defendants going out into the casinos and effecting cash advances. Further evidence of sophistication, and this also addresses the effort to average opposed by defense counsel or counsel for the appellant, is that even when they get to the casino, rather than simply going up and attempting to use the card, they first test it. That first charge on this newbie's card, the $16 charge done by the appellant, was to test the card and make sure it hadn't been reported stolen, make sure it's still working. Do you have to have any additional information to do a cash advance over just using the card? I mean, do you have to know a PIN or do you have to know anything like that? This, I'll answer aside from the record. In Las Vegas, there are different casinos that have different standards. So there's nothing in the record on that here? Not in this case, ma'am. Okay. Would it have been more reasonable to use the max limit on each card as opposed to the way the district judge did it? That would have been a much higher number. It would have been one alternative, because even with just the cards that I had the But I think that there's precedent in this Court that suggests that wouldn't have been appropriate. And so the district court took more of an averaging approach. When you look at the cards, there's some of them. But the number that the district court took was what, 2,000? Yes, ma'am. A card. So where do we pull that out of? Not here, not, you know, I mean, appellant's counsel at least said, okay, we'll average the two. Well, what I was saying when he was saying average the two, he's talking about the same card. It's not different cards. Rather, you're taking one card, you're taking $2,800, and you're adding the $16 test that was done on that card. And to say we're going to average that among the cards, that doesn't make sense, because now you're averaging transactions in one individual card. And if you take that, the more accurate way to do that would be to look at that $2,800 figure, add in the $16 figure that went on top of that, and then there's nothing to distinguish one credit card from the other when you're looking at them. There's nothing in the record that suggests the defendants had any intention different with this card than the next card or the next card or the next card in the sequence. So I believe, given the evidence we have, that this was a reasonable approach. Now, now can you go back to your argument that you put it over to give more evidence and then didn't put in any more? It was my intent to bring in some of the other participants in this scheme. And for various reasons, none of them were available. In fact, one of the participants is still pending sentencing because of medical issues. And so I didn't have those. And so I think the courts approach this, in a case where you don't have a cooperating witness, what is the court to do? And I think here where you see manifestation of their intent in the first card, law enforcement acts, and I think that gives the district court a reasonable basis. Ms. Smith, we don't have a lot of time. Can you go to the other enhancement, the device enhancement, and give me your best argument on that? To the device-making instrument and trafficking? I've conceded at sentencing and even corrected the Court, I believe, in the change of plea colloquy that this defendant isn't the individual who had the device-making instrument, and she's not the individual that brought the cars across State line. But again, she is a member of a conspiracy in which that was done. In fact, that's the way we located her, and that's made clear through some of the discussions with the Court. But what you have here, I'll deal with both trafficking and the device-making equipment. If you look at the change of plea colloquy, and I don't know if you're talking about guilt as opposed to punishment. I mean, the theory of conspiracy, I would understand that for guilt. But now you're talking about a sentencing enhancement. Why would you apply an enhancement in making her responsible for the acts of other co-conspirators? Because the guidelines speak in terms of the offense. And in this case, the offense involved both the trafficking in the stolen credit cards and also the manufacture of counterfeit identification documents. And this wasn't mere chance or mere accident. In fact, during the change of plea colloquy, the defendant very explicitly, and this is the excerpt of record at page 8788, and also quoted in my response at page 27, she very explicitly stated that, yes, she had received cards that had been trafficked right across State lines, and then she took those cards and had or received identification cards that were manufactured to do that. I mean, were manufactured to conform or correspond with the credit cards. And under these circumstances, if I were to go out and ask somebody to make me a dozen of counterfeit driver's licenses to go with my credit cards, and I come into court and say, well, I didn't actually have the implement, I'm not the one who made the cards, I think that would both defy the concept of conspiracy to which she pled, and also the provisions of the sentencing guidelines that a defendant should be held accountable for all the group offense, all the associated crimes. We don't have any cases on this, do we, that says exactly who can be held, who this can apply to, right? Whether it's all the co-conspirators, whether you have to be the one that actually uses the device, is there any case you can cite us to? Not off the top of my head, ma'am, no. In the sentencing guidelines themselves, and I don't have my copy up here with me, there is a section. Well, I'm sure you would tell us if there was one that said we can exactly do this, right? Well, there are sentencing guideline provisions that say that when you're dealing with a group offense, that all the participants in the group share the liability. It's sort of a Pinkerton-type theory that goes into sentencing guidelines when you have a group offense. With that, then, I see my time's almost up. The defense position apparently is that the police should have apologized to Ms. Sonny for interrupting her and set her on her way, because we can't tell anything else about what she was going to do that night. I think that defies common sense. And if you look at the record, there was enough here to support under a clear error standard what the district court did. Otherwise, you put law enforcement in a position where, well, we've got to wait until the defendant goes out and uses all the cards to see what her intent was. I believe there's enough here to support what the district court did. Thank you. I see my time's up. Thank you for your argument. Your Honor, you mentioned why not just apply the max. The problem we have here, Your Honor, is the government specifically asked for a continuance to address the question of how to reach this reasonable economic conclusion. They produce no evidence whatsoever and then supply a chart where there was no opportunity for the defendant to question or cross-examine with respect to the factual accuracy of what the maximums are, what they're not. That's the first point, Your Honor. Secondly, enhancement means to enhance. It means you have to add something for something that you did. You cannot have an enhancement under our guidelines for the acts of other people when the government specifically acknowledges to Your Honors and to Judge Mahan that she didn't manufacture an access device and that she didn't transport anything. She took responsibility for her actions. She got punished accordingly. She got all the points she's supposed to get for the number of cards, the number of victims, and the amount of money if we recalculate it. And the reason, Your Honor, most respectfully there may not be any cases on this is because I don't think anybody's ever tried to give somebody this particular enhancement when they didn't do it. Thank you. Okay. Thank you. All right. The Court's just going to recess for about five minutes and then we'll hear the last matter on calendar.
judges: D.W. Nelson, Callahan, Carney